## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF MISSISSIPPI

**MICHAEL L. SHWARTZ**                                         **PLAINTIFF**

**VS.**                                   **CIVIL ACTION NO.** 4:16cv115-MPM-JMV

**HICHAM KHODR**                                               **DEFENDANT**

---

### COMPLAINT

---

COMES NOW the Plaintiff, MICHAEL L. SHWARTZ ("Plaintiff" or "Shwartz"), and files this, his Complaint against HICHAM KHODR ("Defendant" or "Khodr"), and in support thereof, Plaintiff states the following:

### PARTIES

1. Plaintiff Michael Shwartz is an adult resident citizen of Grenada, Mississippi whose address is 317 Third Street, Grenada, Mississippi 38901.

2. Defendant Hicham Khodr is an adult resident of Metairie, Louisiana who may be served with process at 104 Metairie Heights, Metairie, Louisiana 70001.

### JURISDICTION AND VENUE

3. This Court has personal and subject matter jurisdiction over the parties identified in this Complaint pursuant to 28 U.S.C § 1332, as the parties are completely diverse in citizenship and the amount in controversy exceeds $75,000.00.

4. Venue is proper in this court pursuant to 28 U.S.C. § 1391, as the acts of fraud perpetrated

1

by the Defendant occurred in this District.

**BACKGROUND**

5. For over fifty-nine years, Shwartz's family owned and operated the landmark "Camellia Grill" restaurant located at 626 S Carrollton Ave, New Orleans, Louisiana 70118. In 1984, Shwartz federally registered the basket of associated trademarks ("Marks") and has since diligently and consistently protected those Marks from attempted infringement.

6. Six years before Hurricane Katrina, in 1999, Shwartz decided to sell the one operating original restaurant, but wished to retain his ownership of the Marks as well as the other intellectual property (trade dress, recipes, menus, blueprints, etc.) associated with the brand. To accomplish this goal, Shwartz founded a holding company, Camellia Grill Holdings, Inc. ("CGH"), which became the registered owner of the Marks so that the intellectual property comprising the brand would not be automatically absorbed in an asset sale for a sole operating restaurant.

7. In 2000, on the advice of his then CPA and business advisor S. David Kushner, Shwartz retained Legacy Capital Group, a New Orleans investment banking firm, to market the restaurant. Shwartz and Kushner worked for one year with Legacy to form a master plan under which the business would be marketed, including a comprehensive large prospectus. Legacy failed to develop substantial offers after Shwartz expended a sizable amount of money therefor. No sale occurred, and in 2002, Shwartz terminated Legacy's services, took the restaurant off the market and continued to operate it for a number of years, until Hurricane Katrina struck in 2005.

8. Shwartz testified in his 2015 deposition that the price which Shwartz and Legacy set for the

one unit in 2001 was approximately $3 million ("between $2.5 and $3 million"), intellectual property non-inclusive. This price included the building, Shwartz's operations company Camellia Grill, Inc. and a perpetual license for the intellectual property's use.

9. As a result of Hurricane Katrina, Shwartz decamped New Orleans and permanently settled in Grenada, Mississippi. Shwartz has since August 28, 2005 never domiciled anywhere but Grenada.

10. Shwartz did not reopen the business himself at any time after he left the city, and suffered a stroke in May of 2006.

11. In late 2005, Shwartz's then CPA, Kushner, approached Shwartz in Grenada and apprised Shwartz that Kushner had fielded several inquiries into buying the business. The business was not being actively marketed and the offers were an insult regardless. Then, in early 2006, Kushner advised that he had a potential buyer for the restaurant, Defendant Hicham Khodr, if Shwartz was interested in selling. Kushner had mentioned Khodr to Shwartz years before as a potential buyer for the restaurant. At that time in 2006, Kushner was the simultaneous CPA for both Shwatz and Khodr.

12. Despite not returning to New Orleans, Shwartz wanted to contribute to the city's recovery and decided to proceed with exploring a deal with Khodr to take over the operations of the restaurant. On June 23, 2006, the parties, including Shwartz's former CPA David Kushner, met in Grenada, Mississippi, for the first formal sale negotiations involving the Camellia Grill, at which time the parties agreed to the price to purchase the real estate at the original location, as well as the separate intellectual property license for the use of the brand's entire basket of Marks (including menus, trademarks, recipes, etc.).

3

13. On July 11, 2006, in Grenada, Mississippi, the parties themselves, as well as Kushner and Shwartz's counsel, Mark Stein, engaged in their second and final negotiation, in which the parties discussed a sophisticated twelve point issue list personally drafted by Shwartz. See Camellia Grill Points for Discussion, attached as "Exhibit A." These points notably included that the Marks would always unconditionally remain the property of CGH (Point No. 11), the holding company formed many years ago and owned 100% by Shwartz, as well as certain terms regarding defaults and termination of any agreement(s). Khodr was so eager to discuss these issues that he chartered a jet to fly himself, Kushner and Stein to Grenada for the express reason of reviewing and discussing this twelve point list, as is memorialized in a July 5, 2006 email from Kushner to Shwartz setting up that meeting. See July 5, 2006 email from Kushner, attached as "Exhibit B." Both Stein and Kushner took copious notes at that particular meeting, and which notes clearly memorialize the understanding of all in the room that the Marks were to remain the property of CGH and that there was to be termination and default language contained in the License. See Kushner's notes, attached as "Exhibit C" and Stein's notes, attached as "Exhibit D."

14. Beginning with that initial negotiation, and throughout the remainder of subsequent negotiations, the only assets offered by Shwartz to Khodr were (a) the outright sale of the real estate in question for $500,000, and (b) a license agreement under which Khodr would have an exclusive nationwide right to use the Marks retained by CGH for $1,000,000.00, excluding Oxford, Mississippi and its thirty-five miles circumference as that territory was retained by CGH. The outright sale of any intellectual property by CGH was never discussed or requested by Khodr, nor was this issue ever part of negotiations.

4

15. In his January 2015 deposition, Shwartz testified that for the first time during the July 11, 2006 negotiations, Kushner introduced the idea of bifurcating the real estate sale, keeping the price of $500,000.00 the same, but allotting a portion thereof to the separate sale of the FF&E located at the original location entailing the real property. The initial reason for this suggestion given to Shwartz at that time was to afford Khodr some protection of the FF&E against any debts owed by Shwartz's dormant operations company, Camellia Grill, Inc. However, the first documented reason for the eventual Bill of Sale for Tangible Personal Property came on or about July 25, 2006, after the conclusion of negotiations, when Kushner, on behalf of Khodr, suggested that Shwartz separately transfer the furniture, fixtures and equipment ("FF&E") in the restaurant to Uptown Grill, LLC, the company Khodr indicated he would use to operate that unit, for the purpose of Khodr addressing Louisiana lease tax issues. See July 25, 2006 email chain, attached as "Exhibit E." Shwartz agreed to this arrangement as his only requirement was a total sale price of $500,000.00, regardless of whether the real estate and FF&E were transferred together or separately.

16. Additionally, Khodr insisted on taking title to the real estate in advance of the proposed License Agreement's signing and proposed that RANO, LLC, a third entity also fully owned by Khodr, buy the restaurant real property aside from the separated FF&E. Because this agreement would result in Khodr owning the restaurant building without the use of the Marks, Khodr's counsel amended the intended Bill of Sale for Tangibles to include "trademarks, logos and recipes." Shwartz and his counsel understood this language to refer to the various tangible property bearing any of the retained CGH Marks located within or upon the real property in New Orleans, not an outright sale of the Marks. In support of this

5

understanding, Khodr's real estate counsel and drafter of the Bill of Sale, Randy

Opotowsky, later admitted in a January 2015 deposition that the Bill of Sale was nothing

more than a "placeholder" regarding the intellectual property included therein until the

"global agreement", being the License, was signed mere weeks later. See Opotowsky

Deposition Transcript, Page 41, attached as "Exhibit F."

17. Shwartz relied on that perceived understanding and trust by all parties involved to agree to

the inclusion of the word "trademarks" within the Bill of Sale. Prior to the execution of this

Bill of Sale, Khodr's own counsel, David Bernstein and Randy Opotowsky, both expressed

great concern about Khodr acquiring the real estate prior to the License Agreement being

in place, never mentioning that any alleged rights under the eventual Bill of Sale would

bear upon this concern, but that Khodr insisted on closing the real estate because he was

"comfortable with his relationship with Michael Shwartz." See August 3, 2016 email

chain, attached as "Exhibit G." This exchange illustrates the perceived trust in the

relationship upon which Shwartz detrimentally relied in signing not only the Bill of Sale,

but the License Agreement as well.

18. Notably, Khodr could only personally negotiate in Grenada, not on behalf of any corporate

entity, as none of his corporations involved herein had yet been formed on the negotiation

dates of June 23, 2006 or July 11, 2006. On or about July 20, 2006, Khodr created the three

legal entities through which he would purchase the real estate, FF& E, and license the

Marks. All three entities were and are 100% owned by Khodr. Those entities are 1) RANO,

LLC, listed in Khodr's prior discovery responses as the purchaser of the real estate at the

original location at 626 S. Carrollton Ave in New Orleans, 2) Grill Holdings, LLC, listed as

6

the intended "manager" of that original location, and as well as the named "Licensee" under the License Agreement, and 3) Uptown Grill, LLC, listed as the intended "operator" of the original location as well as the purchaser of the bill of sale for tangible personal property.

19. On or about August 9, 2006, in Grenada, Mississippi, Shwartz signed the real estate sale to RANO, LLC for $490,000.00 and the Bill of Sale for Tangible Personal Property to Uptown Grill for $10,000.00. See Bill of Sale, attached as "Exhibit H." The Bill of Sale listed three sellers therein, being Camellia Grill, Inc., Camellia Grill Holdings, Inc and Michael Shwartz. Each seller lent a separate interest to the Bill of Sale. Camellia Grill, Inc was the operations company and owned the FF&E. Camellia Grill Holdings held the trademarks which were borne upon tangible personal property at the involved location. Finally, as some of the FF&E was attached to the physical plant, Shwartz was personally added as the owner of the property.

20. On or about August 27, 2006, Shwartz (through CGH) entered into a License Agreement ("License") with Khodr through Grill Holdings, LLC, wherein Shwartz agreed to license the intellectual property rights in all Camellia Grill Marks, all "trade dress" associated with Camellia Grill, all rights to the blueprints, plans and specifications for ancillary restaurants, and all menus and recipes developed by or used in the Camellia Grill restaurants. See License Agreement, attached as "Exhibit I."

21. The License which Khodr negotiated and signed clearly specified in numerous provisions that CGH retained ownership of the Licensed "Marks" without reservation to Khodr and that Shwartz would have an ongoing interest in the business through the License and which

7

provisions are cited below:

    a.  that Shwartz (CGH) "owns the intellectual property, trademarks and service marks (Sec. 1.1)

    b.  that Khodr "desires to obtain the exclusive license to the Marks…" (Sec. 1.2)

    c.  that the License would govern the terms under which Khodr could operate restaurants bearing the Marks and to sell ancillary products bearing the Marks. This section does not exclude any territory including the original unit. (Sec. 1.3)

    d.  that Khodr "shall pay [Shwartz] royalties ("Royalties") on "Food Gross Revenue". .and "Novelty Gross Revenue" (Sec 4.2) commensurate with Exhibits 4.6 and 4.7 at the conclusion of the License.

    e.  [Khodr] acknowledges and agrees that all of [Shwartz's] right, title and interest in and to the Marks shall remain the property of Licensor." (Sec 5)

    f.  that Khodr "will: (i) use the Marks only as set forth herein;(ii) refrain from use of the Marks except under the terms of this Agreement"… (Sec 6)

    g.  that Khodr "shall not use any part of the Marks in combination with any other trademark, word, symbol, letter or design". …(Sec 6.1)

    h.  that Khodr " agrees not to adopt any trademark, trade-name, design, logo or symbol, which, is similar to or likely to be confused with any of the Marks. (Sec 6.2)

    i.  that Khodr "will not use the Marks, for purposes other than pursuant to this Agreement. (sec 10.1)

    j.  that Khodr " will not attack the title or any rights of [Shwartz] in and to the Marks,

8

attack the validity of this Agreement, or do anything either by omission or commission which might impair, violate or infringe the Marks, " (Sec. 10.3

k.  that Khodr "will not claim adversely to [Shwartz]… with respect to any right, title or interest in or to the Marks." (Sec 10.3)

l.  that Khodr " will cooperate fully and in good faith with [Shartz] for purposes of securing and preserving [Shwartz] rights in and to the Marks." (Sec 10.4)

   i.  Khodr's subsequent actions would render the Grenada negotiations and his signing the License false and misleading.

22. Almost immediately after the License was signed, Khodr began to tread on defaulting under the provisions therein. He had to request an extension of time through which to reopen the flagship unit in order to operate by the contractual deadline of January 1, 2007. Thereafter, Khodr illegally altered the federally registered trademark, failed to pay certain royalties, failed to provide sublicense information and refused to comply with accounting mandates despite a court order, this last issue resulting in Khodr being found in contempt of court and sanctioned accordingly.

23. In an April 17, 2007 letter, Khodr's then counsel David Bernstein contacted Shwartz's then counsel Mitchell Hoffman to assert that it was Khodr's understanding that CGH and Shwartz as the owner of the Marks were to protect the Marks for the benefit of all parties by timely renewing the registrations therefor when due, referring specifically to License Section 13 as his basis. This is a direct acknowledgment by Khodr that CGH owned the Marks without exception to location of use. See April 17, 2007 letter, attached as "Exhibit J."

9

24. In a September 6, 2007 public television interview, Khodr asserted that Shwartz wanted to "take Camellia Grill to a second level" and that Shwartz "chose Khodr and had faith in him" to carry out Shwartz's vision, acknowledging Shwartz's goals in entering into the relationship through the various contracts. In this interview, Khodr's words portrayed Shwartz as the controller of the Camellia Grill brand who was going to continue to be involved therein, acknowledging that the 2006 negotiations entailed that Shwartz was not selling his interest in the business itself. Furthermore, as Khodr was unilaterally speaking with much determination through his own perception regarding Shwartz's goals and sentiments without Shwartz present, Khodr's assertions mean that Shwartz had to have been given some basis to have that "faith", and as Shwartz had never met Khodr prior to Kushner's introduction thereof in 2006, that basis could only have been cultivated through the Grenada negotiations.

25. In 2008, Khodr executed a perjured affidavit, wherein he swore that he negotiated on behalf of Grill Holdings in New Orleans, Louisiana with the "culmination" of those negotiations being the License (not the Bill of Sale). See Affidavit of Hicham Khodr, attached as "Exhibit K." Beyond containing two clearly perjured statements, as Grill Holdings was not yet formed during the negotiations and all counsel and the involved parties, most notably Khodr himself, have subsequently testified that all negotiations took place in Grenada, Mississippi. Khodr's admittance that the License would be the culminating event of this transaction upholds Shwartz's detrimental reliance in granting Khodr the Bill of Sale "placeholder" accommodation.

26. Section 16 in the License is titled "DEFAULT," stating "Licensor may, in its sole

10

discretion, terminate all of pert of this Agreement in the event that:" with subsection 16.3 further asserting that "Licensee defaults under any of its obligations hereunder and fails to cure such default within fifteen (15) days after written notice from Licensor."

27. Following various ongoing breaches of the License by Khodr, beginning immediately after Camellia Grill reopened in April of 2007, Shwartz through CGH sent Khodr a May 31, 2011 letter per the terms of the License terminating the agreement based on Khodr's failure to cure any and all breaches. Khodr did not seek injunctive relief, nor raised any alleged rights flowing from the Bill of Sale, but rather continued to use the licensed Marks without further permission from Shwartz.

28. Shwartz (CGH) sought a declaratory judgment in Louisiana state court, terminating the License Agreement, which was granted by summary judgment on May 25, 2012. Khodr appealed this judgment to the Louisiana Fourth Circuit Court of Appeals, which affirmed the declaratory judgment. Khodr filled a Writ application to the Louisiana Supreme Court, which was denied on November 1, 2013.

29. The License contains a strict provision regarding the "effects of termination" (Section 12), and which section is divided into three subsections. Section 12. 1 clearly dictates that the Licensee is to prevent consumer confusion by so much as continuing a condition which could infer to the public and ongoing association between Khodr and the brand. Section 12.2 states that the Licensee is to "immediately" cease use of all licensed Marks upon termination, and that all interest in and to the Marks reverts back to CGH. Neither of these provisions' effects has to date been realized by Shwartz as Khodr continues to use all attributes of the brand at two locations, has refused to cede the interests back to Shwartz,

and has created nothing but the very consumer confusion which he bound not to portray to the public. Not only are these actions by Khodr in contravention to the agreed upon License terms, but also directly contradict Khodr's acknowledgment of Shwartz's twelve point concerns list at the July 11, 2006 Grenada negotiations.

30. On May 25, 2013, after the Louisiana Fourth Circuit upheld the trial court's License termination, but before the Louisiana Supreme Court denied writs, Erika Gates, a historical preservationist, nominated the Camellia Grill for historic status with the Historic District Landmarks Commission ("HDLC"), which would prohibit the removal of the Marks, specifically the trademarked facade design thereupon, from the restaurant despite the termination of the License and allow Khodr to absorb the Marks without just compensation and in contravention to the License's terms. Shwartz and his counsel learned of this endeavor on June 11, 2013. On June 12, 2013, Shwartz's counsel Irl Silverstein contacted the HDLC by phone to inform that entity of the contractual provisions barring such activity, and Silverstein followed this with a June 14, 2013, formal letter to the HDLC repeating such. On June 18, 2013, despite the protests of Shwartz's counsel, the City of New Orleans's Historic Districts Landmarks Commission ("HDLC") accepted the nomination of the Camellia Grill building. CGH subsequently filed suit in federal court against both, Khodr's interests as well as the City of New Orleans, in order to enjoin the nomination process and to preserve CGH's rights in and to the Marks. On August 15, 2013, the HDLC formally granted the study for historic status of the building and therefore placed that entity under its control thus disallowing any alterations to the trademarked facade. On August 16, 2013, CGH's suit was dismissed without prejudice by the District

12

Court on the grounds of prematurity.

31. Khodr's acceptance of the HDLC nomination and further landmark study was in contravention to the July 11, 2006, negotiated terms regarding CGH's unconditional retained mark ownership. Khodr's intent via the HDLC to simply absorb CGH's assets, thus denying Shwartz his agreed to negotiated retained ownership of the marks and his relief upon the relationship's termination, was the first instance at which Shwartz no longer regarded the issues as simple breaches but alternatively as a relationship built on myriad fraudulent representations by Khodr, both directly and indirectly through his representatives.

32. In Khodr's August 6, 2013, reply brief concerning HDLC matter, Khodr for the first time used the Bill of Sale as an exhibit through which to assert any rights other than those established in the License agreement. Khodr in that same brief also curiously argued that "This License Agreement applies to use of the licensed service marks ***not only at the 626 South Carrollton Avenue location***, but also applied to a Camellia Grill Restaurant opened by Grill Holdings in April 2009 in Destin, Florida, which was forced to close due to adverse market conditions, and applies to a third location opened by Grill Holdings in December 2010 on Chartres Street in the Vieux Carré." In this particular instance, Khodr takes two polar opposite stances, thus showing the intent to mislead Shwartz into the agreement. On August 6, 2013, Khodr initially urged the Bill of Sale as an exhibit to eventually invoke alternate ownership rights over the marks yet simultaneously argued that the terminated License controlled all of the relationship's parameters, including the original unit, and which indeed conforms to the terms established in the Grenada

13

negotiations.

33. According to Shwartz's counsel Silverstein, in the August 14, 2013, HDLC oral arguments before the district court, Khodr outright asserted ownership rights in the Marks through the Bill of Sale based upon the words "trademarks, logos, recipes, etc.," this newfound statement being in clear contradiction to Randy Opotowsky's testimony as the Bill of Sale's drafter that the inclusion of the word "trademarks" was intended solely as a "placeholder," and again on which representation Shwartz relied to engage and sign the Bill of Sale in Grenada. Shwartz was approached in Grenada for an accommodation, a favor, for Khodr in the form of a segregation of the FF&E to address certain taxes, as well as to serve as a two week protective "placeholder" regarding the Marks according to Khodr's own attorney and drafter of that same Bill of Sale. Khodr's subsequent representations asserting this opposite meaning and purpose of the Bill of Sale (to those initially represented to Shwartz) show his deceit and malicious intent in structuring the transaction and the representations made.

34. Despite the finality of the declaratory judgment after the Louisiana Supreme Court's denial of Khodr's Writ application terminating the License, Khodr continued to operate two restaurants using the Marks. On December 3, 2013, Khodr's company Uptown Grill as the purchaser of the Bill of Sale sued Shwartz, Camellia Grill, Inc., and CGH in federal court demanding that the court enforce the Bill of Sale as a transfer of ownership of the Marks and declare Khodr as the owner of the Marks only at Carrollton Avenue location. In this Complaint, Khodr's new portrayal (urged for the first time in the entire relationship) was that the License applied only to "additional" units, despite the fact that Section 1.3 of the

14

License clearly states that the License governs the use of the Marks in any and all restaurants, not just Carrollton Avenue location, as well as that Khodr pleaded just four months earlier that the License governed the Marks not only at Carrollton but at all locations.

35. On March 27, 2014, Shwartz through CGH filed suit in Louisiana state court against Khodr for trademark infringement caused by Khodr's refusal to observe the contractual mandates to cease use of the licensed Marks immediately upon written notice of termination. However, this suit was removed to federal court, as well.

36. On July 10, 2015, the district judge ruled dispositively on Khodr's Motion for Summary Judgment and held that the Bill of Sale transferred the Marks to Khodr, not just for the Carrollton Avenue location, but for the entire territory of the United States. The district court also awarded Khodr the good will and trade dress associated with the brand and dismissed Shwartz's complaint with prejudice. It is critical to note that the district court disallowed the introduction of parol evidence in its ruling, determining that the Bill of Sale was unambiguous despite the inclusion of "trademarks" within tangible personal property itemizations and Shwartz's attempted introduction of Randy Opotowsky's basis for including intellectual property within the Bill of Sale. The district court disregarded the clarifying extrinsic evidence yet added that "the court itself has doubts about what the Parties subjectively intended when they entered into the transactions at issue".

37. On March 23, 2016, despite that Shwartz never offered the Marks for sale at any time, nor that Khodr requested such a sale, the Fifth Circuit Court of Appeals ruled that the Bill of Sale unambiguously sold the marks for the original unit to Uptown Grill, but reversed and

15

remanded the specific issue of the scope of the Marks' transfer regarding ancillary units for further proceedings in district court as well as the force of the License Agreement. The panel remanded finding that since Khodr appointed Uptown Grill as a sublicensee and the License contains several provisions which automatically relegate all sublicensees ("affiliates") to be considered the "Licensee", thus a component of a listed "Party" to the License and bound to all of the License's provisions, the district court possibly excessively awarded Khodr all of the rights outside of the original location. Furthermore, the panel in its ruling bound Uptown to all License provisions except one section (Section 17.5), which supersedes and replaces **_all_** prior agreements between the Parties to the License. The panel held that since Uptown did not directly sign the License, but was instead bound through sublicensing, Uptown's Bill of Sale was not a prior agreement between the "parties" to the License. However, the same panel found that all other License provisions, including by reference the provisions addressing CGH's Mark ownership, can and indeed do bind upon Uptown, apparently without Uptown's direct signature being on the agreement.

38. As was the situation in the district court, the Firth Circuit did not consider parol evidence while interpreting the scope of the issues, affirming that the Bill of Sale is unambiguous, so the parties initial representations and intentions while entering this relationship (beyond the basic four corners of the Bill of Sale) have to date never been considered by any prior court, and which intentions are the primary gravamen of the suit herein. Shwartz's damages far exceed the boiled down approach that Shwartz imprudently signed the Bill of Sale and that is the end of the reasoning assuming that the fault lies unilaterally with Shwartz. The License was heavily negotiated and the non-negotiated Bill of Sale had a

16

specific set of purposes attached thereto, none of which either overtly or by intimation encompassed the direct sale of any marks, and which documented purposes therefor were presented by Khodr's camp to Shwartz in Grenada for his consideration and his signature.

39. Shwartz is not asking this Honorable Court to re-adjudicate prior litigations, but as extrinsic evidence was barred from the prior proceedings and such evidence will clearly answer why Shwartz accommodated the Bill of Sale for Khodr, this issue must be explored so that Shwartz may be made whole at some point. Shwartz reluctantly accepts that his business (in part currently) has been permanently awarded to Khodr and does not ask this Court to reinstate that asset, but there must be a thorough investigation as to how that massive loss could have occurred given the intensive Grenada negotiations wherein the terms centered on only a license agreement and real estate sale, the allegedly genuine initial representations made at those negotiations and the number of involved attorneys and a well-regarded CPA.

40. Despite the prior rulings, the sole contract under which Khodr performed and which governed the relationship for seven years, between 2006 and 2013, was the License Agreement, and which is clearly ratified by Khodr's formation of defenses thereunder in all of the prior state claims. Khodr's initial ratification of the License came early on with the appointment of Uptown Grill, the purchaser of the allegedly sovereign Bill of Sale transferring the Marks, as a sublicensee, binding Uptown to all provisions of the License as a direct affiliate of Grill Holdings, the prime Licensee, as was recently upheld by the Fifth Circuit. Prior to August 6, 2013, Khodr never attempted to use the Bill of Sale for any rights, much less to invoke some underlying ownership in the Marks.

17

41. These actions along with the clearly documented 2006 Grenada negotiations demonstrate that the Marks were never offered for outright sale and that Khodr has taken actions to maliciously defraud Shwartz of this valuable asset.

### FACTS RELATED TO THE COMPLAINT HEREIN

42. During the recent litigations, it came to Shwartz's attention that Khodr had been placed under a restraining order in August, 2005, less than one year prior to the Grenada negotiations with Shwartz, and which order was installed to prohibit Khodr from defrauding investors in another deal. See Petition and Order, attached as "Exhibit L."

43. Unlike Khodr, Shwartz has never to date altered or enhanced his version of any of the facts or terms contained herein. Shwartz has not once denied willingly signing the Bill of Sale (which was suggested to him and executed in Grenada), but Shwartz testified that he executed the Bill of Sale with the Marks being included under the heading "tangible personal property," which in his mind meant the Marks as they were attached to other tangible property, and furthermore only to serve as a unilateral tax consideration and trademark stopgap for Khodr. See January 7, 2015 Shwartz deposition, pages 115-116, attached as "Exhibit M."

44. The only inclusion of the involved Marks in any negotiations was through an intended use agreement, never an outright sale as that avenue was neither offered by Shwartz nor requested by Khodr. The Bill of Sale was not negotiated, but was instead requested of Shwartz, and the terms of use and the real estate sale had been previously agreed to in Grenada with Khodr and various legal and accounting professionals present. Khodr himself swore in his 2008 affidavit that the License was the "culmination" of the

18

negotiations. See Exhibit K. Given these facts, Shwartz did not feel any danger in granting to Khodr the Bill of Sale accommodation as there was no apparent divergence in the parties understanding regarding the contractual terms and representations of ownership. Had the Bill of Sale been a third contract offered by Shwartz, this entire argument would be moot, but as the Bill of Sale was added by Khodr's camp serving only as a protection for Khodr and having no benefit to Shwartz whatsoever, Khodr has now turned what was a courtesy into the destruction of Shwartz's sole business. There are no documented reasons for the Bill of Sale other than those urged by Shwartz, being Khodr's tax issues and a stopgap trademark protection, the "placeholder" to which Opotowsky referred under oath.

45. The aggregate price for the real estate always remained $500,000.00, but Kushner requested that the price be bifurcated with a minor amount being dedicated to an FF&E segregation. Therefore, by Khodr urging that the $10,000.00 Bill of Sale permanently transferred the Marks under the Bill of Sale, this is a vast departure from the original real estate deal agreed to in the June 23, 2006 negotiation, which entailed solely the building and land for $500,000.00. Opotowsky has testified that his inclusion of the trademarks in the Bill of Sale was temporary, not indicating at any time that this was to serve as a permanent assignment of the marks, and this was Shwartz's understanding, as well. It appears that Khodr intended to keep the aggregate price of the real estate the same at $500,000.00 while, unbeknownst to Opotowsky and Shwartz, intending to eventually invoke millions of dollars in permanent asset transfers through the Bill of Sale (with no augmented consideration for Shwartz) at a later date. This is especially suspicious since only two weeks after the Bill of Sale was signed, Khodr signed the License containing

19

terms explicitly establishing CGH as the marks' owner.

46. Shwatz is not suing under the various contracts themselves or on behalf of CGH, but Shwartz is suing personally through his own detrimental reliance on Khodr's misrepresentations in the Grenada negotiations which induced Shwartz (as CGH's sole shareholder) to insert his assets into this deal. This matter may include a Louisiana corporation (CGH) and what would become Louisiana contracts, but this suit in reality turns upon a fraud launched and cultivated in Mississippi during the preliminary negotiations, and which time frame is the primary era involved herein. Unlike the License Agreement's venue mandate for actions directly connected thereto, there is no preset dictation as to where Shwartz can personally file suit against Khodr.

    a. Ultimately, as Shwartz is a Mississippi resident and the depletion of his personal life and personal net worth (as a result of this relationship) domicile with Shwartz himself and can only affect Shwartz in Grenada, venue is proper in this jurisdiction.

47. Khodr has litigated under a "heads I win, tails you lose" mantra, intending either to prevail or if not, never to allow Shwartz to realize his agreed upon relief. Khodr litigated for five years in a Louisiana state court, forming defenses under only the License, never invoking any other alleged rights such as the Bill of Sale, and thus forced Shwartz to waste years of time and money believing that a prevalence would result in the relief to which Shwartz was contractually entitled and which relief was negotiated in Grenada. Indeed, Khodr never introduced any rights under the Bill of Sale for seven years, until he ran out of luck in the state court, up to and including the Louisiana Supreme Court, lost the License, and faced immense damages for continuing the use of the Marks as a direct result of his own refusal

to cure contractual breaches when opportunities were provided. Shwartz would not have placed his assets for use or sale or signed any of the contracts, particularly the Bill of Sale, had there not been negotiated protective measures for Shwartz included in the License and a mutual understanding that the License would govern the relationship, which terms Khodr signed to uphold but later unilaterally abrogated.

48. Khodr never once asked to buy CGH or Shwartz's operations company, Camellia Grill, Inc. Instead, Khodr obviously intended to obtain the fruits of outright ownership of the entire concept through the misrepresented $10,000.00 Bill of Sale, being only .0033 the price Shwartz asked for the one existing unit in 2000. As the relationship was understood by all parties from day one to center around a sophisticated instrument, the License, and as Shwartz spent thousands of dollars drafting and negotiating that very License, Khodr must explain why he traveled to Grenada to negotiate and subsequently sign the License, by his own admission the "culminating" contract, if he covertly intended for the relationship to stop at the Bill of Sale.

49. The Bill of Sale is a two page general boilerplate contract whereas the License is a twenty-three page quite specific instrument containing detailed schedules of the intellectual property involved therein, as well as explicit performance terms and alleged relief for Shwartz. It is implausible that Shwartz would invest the massive amounts of time and money drafting and negotiating the far more sophisticated License only to deviate at the last minute and sign the Bill of Sale to give away his business for $10,000.00.

50. Khodr's underlying agenda is that much clearer when considering that the July 11, 2006, notes taken by both CPA Kushner and Shwartz counsel Stein at the Grenada negotiations

21

include the word "default," thus memorializing that this specific topic was negotiated by Khodr prior to signing the various contracts. Furthermore, as Khodr signed the License containing explicit default language, when coupling License Sections 12, "Effects of Termination", and Section 16, "Default", it is undeniable that Khodr knew the self-negotiated consequences for nonperformance of the License yet he chose to leave breaches uncorrected to irritate Shwartz while at the same time intending to evade any consequences therefor by invoking the alternate rights under the Bill of Sale. Again, Khodr negotiated the contracts in Grenada and induced Shwartz to enter the deal through misrepresentative tactics.

51. As the business was not being marketed for sale at the time, it was Khodr who eagerly approached Shwartz for a deal, not vice versa. Shwartz was very specific about what he was offering and the prices therefor. The paradigm was sophisticated as this was to be a license, and the real estate was to lose any and all meaning as a Camellia Grill if the relationship soured and the use repossessed. Furthermore, it is Khodr who suspiciously insisted on closing on the real estate only two weeks before the License (granting Khodr exclusive mark usage rights) was to be signed, and which demand gave rise to Opotowsky's temporary inclusion of the marks within the Bill of Sale to serve as the "placeholder" until the License was signed.

52. "But for" Khodr's uninvited intrusion into Shwartz's life in Mississippi, Shwartz would still own his entire asset base and could have devoted the otherwise wasted past decade to productive, contributive endeavors instead of being forcibly relegated to a perpetual litigant. Shwartz has lost the prime years of his life, being his entire 40's and early 50's,

through his engagement in this deal, and those particular years comprises anyone's best earning and enjoyment era. Khodr, either as a defendant or a plaintiff, has exclusively been the cause of relentless litigations since 2008, and Shwartz's life has contained virtually no other options during that period.

53. As was stipulated in the 2006 Grenada negotiations, this was supposed to be a deal wherein Shwartz's primary enrichment would be subordinated to future units, and which Khodr conceded in his 2007 interview was Shwartz's main reason for engaging the relationship with Khodr, a major expansion of the brand. Khodr has effectively unilaterally controlled the front end and the rear end of this relationship, obtaining a sweetheart deal for the real estate and License while now ensuring that not only is there no subordinated benefit for Shwartz but that Shwartz has no future whatsoever within his own business.

54. Khodr demanded an exclusive License over the entire territory excluding Oxford, Mississippi, but Khodr has decided not to build any more Camellia Grill units per his own past newspaper interviews and deposition testimony, yet Khodr will not cede the Marks back to Shwartz, thus keeping a stranglehold on Shwartz's options. Furthermore, had Shwartz built the Oxford unit, which was not built due to the ongoing litigations' time constraints, Khodr would likely claim that unit as well under his current stance that the License should grant him universal rights despite being installed merely as a "use" of the marks. Khodr has essentially blocked Shwartz from benefitting from his brand, either directly through Khodr or otherwise.

55. Despite Khodr's own 2008 affidavit assertion that the License was the "culmination" of the negotiations, he has in fact inverted the scenario to one in which the final and universal

23

contract, that same License, would somehow subordinate to the prior Bill of Sale. No one involved in the negotiations or subsequent drafting of the contracts aligns with Khodr's actions in this respect, as all involved counsel as well as Shwartz considered the License to be the ultimate governing instrument regarding the Marks's ownership and usage. In that August 3, 2006, email chain, it was Khodr's own counsel Bernstein and Opotowsky which expressed deep concern about Khodr's purchase of the real estate without the License in place, not referring to any alleged rights under the Bill of Sale whatsoever. Khodr has spared no expense of time and effort to disavow nearly every provision of Shwartz's License since its signing, up to and including the effects of termination thereof, but after its initial invocation in 2013, Khodr has considered his own contract, the far less detailed Bill of Sale, to be sacrosanct in every respect. This is especially duplicitous as the License, not the Bill of Sale, was the mutually negotiated instrument. This as well shows Khodr's intention to negotiate and sign the "culminating" License while covertly intending to stop the relationship at the Bill of Sale if the License was terminated.

56. In essence, Khodr has used Shwartz's own assets to destroy Shwartz. Khodr's ongoing use of the brand after the License's termination has generated the very proceeds which Khodr has used to finance the litigations which have caused Shwartz's duress.

57. Khodr now owns assets which were not offered for outright sale, the Marks, and this issue is critical as how could this permanent transfer occur unless there was/is a covert agenda in play? Everyone at the Grenada meetings knew what was being sold and what was being licensed, so the parties' true intentions must be explored.

58. Khodr's fraudulent departure from his (and his representatives') initial representations in

24

Grenada continues to play out to date. Khodr now diverges from his own counsel's actions as despite Opotowsky's January 2015 deposition testimony asserting that his inclusion of any intellectual property within the Bill of Sale was solely for temporary protective purposes and with no mention of any permanent transfer thereof, Khodr continues to argue for permanent rights under the Bill of Sale, up to and including in his Fifth Circuit oral arguments. As well, in those same Fifth Circuit arguments, Khodr argued that the License should morph from a contract entailing only a use into a situation wherein Khodr (paying no consideration) owns the Marks for the territory outside the original location.

59. The further New Orleans litigation will not offset that there was clear fraud committed in Mississippi or the damages therefrom, being irreversible lost years of Shwartz's life quality. As well, Khodr has used the situation to destroy Shwartz's reputation as Khodr has distorted the facts and used the media to portray himself as a victim and to vilify Shwartz, and which has turned the public so vehemently against Shwartz that the public has pledged to boycott any Shwartz-involved restaurant. Regardless if Shwartz recoups any rights, his use thereof is now greatly mitigated.

60. The prior rulings solely address the Bill of Sale as it may or may not have transferred the marks, never considering why or under what representations it was executed. The intentions of the parties have never to date been explored by any court, nor have Shwartz's personal damages been an issue in prior suits.

## COUNT I
## COMMON LAW FRAUD

61. Shwartz incorporates the preceding paragraphs as though fully set forth herein.

62. Khodr's actions described above constitute common law fraud, perpetrated as a continuing

25

scheme to defraud Shwartz of his ownership of the Marks in question, subjecting Khodr to intentional tort liability.

63. Khodr negotiated and subsequently signed the final contract in the series, the License, while knowingly and purposefully making false and material representations of fact, primarily agreeing that CGH retained the Marks' ownership, and while possessing a covert alternate set of intentions under the prior Bill of Sale, intending that Shwartz would rely on the false representations to his detriment, and for Khodr's benefit.

64. Shwartz reasonably relied on these false representations and was, in fact, injured due to his reliance.

65. The frauds perpetrated by Khodr against Shwartz directly caused Shwartz to suffer loss of life quality, loss of business opportunities, and net worth.

66. Shwartz is entitled to recover punitive damages, and to recover its reasonable attorney fees, litigation expenses and costs.

## COUNT II
## UNJUST ENRICHMENT

67. Shwartz incorporates the preceding paragraphs as though fully set forth herein.

68. Khodr is liable to Shwartz for unjust enrichment under Mississippi law.

69. Khodr's acts have caused Shwartz damages and unjustly enriched Khodr.

70. Equity requires that Khodr pay Shwartz for the reasonable value of the Marks and his use thereof.

## COUNT III
## CONVERSION

71. Shwartz incorporates the preceding paragraphs as though fully set forth herein.

72. Shwartz owned the Marks at the time of Khodr's fraudulent interference.

73. Khodr intentionally interfered with Shwartz's ownership of the Marks, depriving Shwartz
of possession, use, and revenue derived from the Marks in question.

74. Khodr's acts were and are willful and intentional.

75. The acts of Khodr have caused Shwartz damages as hereinafter alleged.

## COUNT IV
## FRAUDULENT MISREPRESENTATION

76. Shwartz incorporates the preceding paragraphs as though fully set forth herein.

77. Khodr knowingly made the false and material representations (to Shwartz prior to the Bill
of Sale's execution) that the Bill of Sale pertained only to "Tangible Personal Property"
and would serve solely as a "placeholder" until the License's signing, as well as to address
Khodr's lease tax issue, not to permanently transfer ownership of the Marks, and which
false representations induced Shwartz to sign the Bill of Sale.

78. Shwartz did not know the falsity of the representations, relied upon their truth, and had the
right to do so.

79. The acts of Khodr have caused Shwartz damages as hereinafter alleged.

## COUNT V
## NEGLIGENT MISREPRESENTATION

80. Shwartz incorporates the preceding paragraphs as though fully set forth herein.

81. Khodr was negligent in representing to Shwartz before the Bill of Sale's execution that the
Bill of Sale would serve solely as a "placeholder" until the License's signing and to address
Khodr's tax issue, not to permanently transfer ownership of the Marks, and which
representations induced Shwartz to sign the Bill of Sale.

27

82. Shwartz did not know the falsity of the representations, relied upon their truth, and had the right to do so.

83. The acts of Khodr have caused Shwartz damages as hereinafter alleged.

### DAMAGES

84. Shwartz incorporates the preceding paragraphs as though fully set forth herein.

85. By reason of Khodr's fraudulent actions, devaluation of Shwartz's potential use of the Marks, value of the brand at the time of the License's signing, Shwartz's loss of life quality, business opportunities and net worth, and that Shwartz's dream of an expanded Camellia Grill chain will not likely be realized, which would be of significant value, Shwartz has and will continue to suffer damage to his business, reputation and goodwill, and the loss of sales and profits Shwartz would have made but for Khodr's acts, and will further suffer the costs of remediating the harm to Shwartz's goodwill which has resulted.

86. Khodr has wrongly profited from and been unjustly enriched by his conduct.

87. Shwartz is entitled to damages, costs, reasonable attorneys' fees and Shwartz's rights under the common law and the statutory law of the state of Mississippi.

88. Shwartz's remedy at law is inadequate.

### DEMAND FOR RELIEF

WHEREFORE, PREMISES CONSIDERED, Shwartz prays:

That Khodr be required to account to Shwartz for any and all benefits or profits fraudulently derived by Khodr, and for all damages sustained by Shwartz by reasons complained of herein;

That Khodr be required to pay punitive damages in the amount of $100,000,000.00 for the

reasons complained herein;

That the costs of this action, including attorneys' fees, be awarded to Shwartz;

That Khodr transfer to Shwartz all revenue improperly gained or withheld; and

That this Court grant to Shwartz such other and further relief as the Court may deem just,

proper, and equitable under the circumstances.

### JURY DEMAND

Shwartz demands a jury trial on all claims.


RESPECTFULLY SUBMITTED, this the _8th_ day of June, 2016.


_____
Michael L. Shwartz
317 Third Street
Grenada, MS 38901

OF COUNSEL:
_/s/Stephan L. McDavid_
STEPHAN LAND MCDAVID (MSB#8380)
MCDAVID & ASSOCIATES, PC
1109 Van Buren Avenue
Post Office Box 1113
Oxford, Mississippi 38655
Telephone: (662) 281-8300
Facsimile: (662) 281-8353
smcdavid@mcdavidlaw.com


Milton Dannelly "Dee" Hobbs, Jr
Harris Shelton Hanover Walsh PLLC
829 N Lamar Blvd Ste 2
Oxford, Mississippi 38655
Telephone: (662) 234-7447
Fax: (662) 234-3776
dhobbs@harrisshelton.com

29